IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK ADAMS, et al., | ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Case No. 17 C 8544 |
| BRG SPORTS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |
| FREDDIE ADAMS, et al., | ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Case No. 17 C 8972 |
| BRG SPORTS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |
| QUINCY BAKER, et al., | ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Case No. 18 C 129 |
| BRG SPORTS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

  The plaintiffs in these cases, all of whom played high school football, sued BRG Sports, Inc. and Riddell, Inc., which design, manufacture, and sell football helmets. These cases were transferred here from the Northern District of California, where the

plaintiffs originally filed the lawsuits. Following transfer, the Court essentially treated the cases as if they had been consolidated here as a mass-tort multidistrict litigation (MDL) proceeding.

In a first amended "master complaint" containing allegations common to all plaintiffs and in individual "short-form complaints" with allegations specific to each individual plaintiff, the plaintiffs allege that the defendants' negligence (design defect and failure to warn) caused them to suffer brain and neurocognitive injuries. The Court, with the assistance of the parties, then selected a number of "bellwether" cases, in which full discovery, including expert discovery, would be taken. That process has been completed through the deadline for the plaintiffs to designate experts.

The defendants have filed several motions, including three motions to strike/exclude the report and testimony of the plaintiffs' only expert, Dr. Randall Benson, on various grounds and two motions for summary judgment on all of the bellwether plaintiffs' claims. In support of their motions, the defendants argue that the Court should strike and/or exclude Dr. Benson's expert testimony—which they describe as vague and conclusory—based on Federal Rule of Civil Procedure 37(c)(1), Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The defendants further contend that with or without Dr. Benson's expert testimony, the plaintiffs cannot prove the causation element of their claims, which has two aspects: general causation and specific causation. The defendants also argue that without this, no reasonable jury could find for the plaintiffs on any of their claims.

For the reasons set forth below, the Court grants summary judgment in favor of the defendants on the plaintiffs' design defect claims but denies the motion on the

plaintiffs' failure to warn claims.

## Background

The following facts are undisputed except where otherwise noted. The plaintiffs are all former high school football players; some played college football, too. Many of them played in Texas and Iowa. There are eight bellwether plaintiffs: Todd Bradford, Simson Green, Jaquaries Johnson, Gregory Page, Michael Sterns, Ashton Whitby, Walker Whitehorn, and Jeffrey Wodka. Either Texas or Iowa substantive law applies to each of these plaintiff's claims. The defendants are two related business entities: BRG Sports, Inc. (BRG), formerly known as Riddell Sports Group, Inc., and Riddell, Inc., a wholly owned subsidiary of BRG. Both companies are involved in the manufacturing, distribution, and sale of Riddell football helmets. For simplicity's sake, the Court will refer to the defendants collectively as Riddell.

Each plaintiff wore a Riddell helmet during the time period relevant to these lawsuits; some as early as 1975 and others as late as 2002 or even later. The purpose of a football helmet is to mitigate the risk of head injuries and ensure safety during game play. The National Operating Committee on Standards for Athletic Equipment (NOCSAE), formed in 1969, implemented football helmet safety standards in 1973; its standards cover Riddell helmets. The plaintiffs contend that as football players, they sustained various head injuries during game play—namely from blows to the head.

**A.** **Riddell adds warning labels**

Beginning in 1983 and until the late 1990s, Riddell affixed warning labels onto the back of their football helmets. The warning stated: "Do not use this helmet to strike an opponent. Such an action is against football rules and may cause severe brain or

neck injury. Playing the game of football in itself can cause injury, and no helmet can prevent all such injuries." Am. Master Compl. ¶ 12 (dkt. no. 184). The plaintiffs contend that Riddell's warnings were insufficient and that a better warning would have prompted them to avoid playing football altogether, choose a safer helmet, or play football differently. Riddell disputes these contentions and says that without evidence of a causal link between the plaintiffs' alleged injuries and Riddell helmets, the adequacy of warnings do not matter.

B.    **Riddell introduces new Revolution helmet**

In 2002, Riddell introduced a new product—the "Riddell Revolution Helmet"—which it claimed to be 31% safer than other helmets on the market. Am. Master Compl. ¶ 16. The plaintiffs contend that they suffered brain injuries caused by Riddell's football helmets—older Riddell products and the Revolution line of helmets—because these helmets did not adequately protect them against injuries from concussive and sub-concussive blows to the head. The design defects alleged by the plaintiffs include (1) padding liner systems that lacked newer, safer, and better energy absorbing materials; (2) substandard foams that did not reduce force to the forehead; (3) insufficiently thick padding; and (4) the lack of safer and better energy absorbing systems, such as air-filled chamber-based systems. *Id.* ¶ 17. The plaintiffs say that Riddell marketed all of their helmets as safe equipment that would protect football players—especially from concussions. *Id.* ¶ 18.

C.    **The plaintiffs' brain and neurocognitive injuries**

Each of the plaintiffs claim to suffer from brain and neurocognitive injuries—namely mild traumatic brain injuries (MTBIs). MTBIs include concussions.

4

A concussion can cause temporary or permanent loss of normal brain function. The effects of a concussion may be mild, including headaches, lack of concentration, memory and judgment problems, coordination issues, and difficulty with balance. Significant effects of concussions include post-concussion syndrome (PCS), chronic traumatic encephalopathy (CTE), and second impact syndrome (SIS). PCS symptoms include chronic headaches, fatigue, memory problems, fogginess, depression, impulse issues, and other physical, cognitive, and behavioral problems. CTE is a neurodegenerative disease caused by repetitive trauma to the brain; it eventually leads to dementia and other neurological disorders and can have other cognitive and behavioral effects. SIS occurs when an athlete who has sustained a concussion experiences another brain injury before recovering from the first concussion; it can cause serious head trauma or death.

During their depositions, each bellwether plaintiff testified about concussions they believe they sustained during game play as well as concussion diagnoses from medical professionals. Some bellwether plaintiffs relied on other evidence to indicate that they suffered concussions, such as deposition testimony from Green's mother and Johnson's mother; both of whom believe that their sons sustained concussions. Riddell contends that the mothers' deposition testimony is neither admissible nor sufficient to prove that they suffered concussions.

For some bellwether plaintiffs, the scope and existence of their long-term brain and neurocognitive injuries were only recently discovered. These plaintiffs experienced the neurocognitive effects of injuries only as recently as 2017. The plaintiffs contend that a better designed helmet would have prevented or lessened the severity of their

injuries. Riddell does not dispute that the bellwether plaintiffs each wore a Riddell helmet at some point during their football careers, but it contends that the helmets did not cause the plaintiffs' injuries.

## D.     The plaintiffs' design defect theory

In an October 5, 2018 order on Riddell's motion to dismiss, the Court addressed the plaintiffs' burden of proof regarding their causation theory of liability. The Court explained that there are two aspects of causation. "The first is general causation, that is, whether the product or exposure has the capacity to cause the injury the plaintiff alleges. The second is specific causation, that is, whether the product or exposure in fact caused the plaintiff's injury. Both must be alleged." Order on Mot. to Dismiss at 6 (dkt. no. 182). In this order, the Court dismissed, with leave to amend, short-form complaints filed by the plaintiffs because they did not include any allegations regarding causation. The plaintiffs filed their first amended master complaint and second amended short-form complaints on November 2, 2018.

On May 27, 2019, the Court—with the parties' input—selected eight bellwether plaintiffs. The bellwether plaintiffs contend that they suffer from various medical problems resulting from head trauma they experienced playing football while wearing Riddell helmets, including memory loss, headaches, depression, irritability, aggression, attention and concentration issues, anxiety, and impulsiveness. They attribute this to the defective design of Riddell helmets and the lack of adequate warnings.

In August 2020, the plaintiffs designated Dr. Randall Benson as their lone expert on both general causation and specific causation. (Plaintiffs have a separate warnings expert.) Dr. Benson authored an expert report totaling ten pages. In relevant part, Dr.

Benson opines:

> It is my opinion that concussive and sub-concussive blows to the head suffered while playing tackle football can and do cause mTBI and other brain injuries cited by Plaintiff in this case. It is further my opinion that playing football and suffering these blows to the head while wearing a properly designed and engineered football helmet can reduce the incidence and injuries complained of if the helmet is worn properly and well designed.

Def.'s Ex. B, Dr. Benson Expert Rep. (General Causation), at 10 (dkt. no. 367-2). The deadline for deposing general causation experts—which, in the plaintiffs' case, includes only Dr. Benson—was November 9, 2020. Dr. Benson was not deposed.

As indicated earlier, the plaintiffs assert a negligence claim against Riddell for defective design and inadequate warnings (count 1) and strict liability claims based on design defect (count 2), and failure to warn (count 3).

## Discussion

On November 19, 2020, Riddell moved to strike Dr. Benson's report on general causation and exclude his testimony on that topic, citing inadequate disclosures that failed to meet the requirements of Federal Rule of Civil Procedure 26(a)(2), as well as failure to meet the standards for admissibility under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Soon after, the plaintiffs designated Dr. Benson as their sole expert on specific causation; he authored eight specific causation reports regarding each bellwether plaintiffs. The eight reports each include identical content; they do not reference the individual plaintiffs other than on the title page of each report, nor do they reference Riddell. Riddell then moved to strike Dr. Benson's specific causation reports and testimony on the grounds similar to those it had cited for exclusion of his general causation report and testimony.

Riddell has also moved for summary judgment, arguing the insufficiency of the plaintiffs' evidence with or without Dr. Benson's testimony.

**A.   Riddell's motion for summary judgment on general causation**

To obtain summary judgment, Riddell must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Egonmwan v. Cook Cty. Sheriff's Dep't.*, 602 F.3d 845, 849 (7th Cir. 2010) (quotation marks omitted). The Court views the evidence and draws all inferences in favor of the nonmoving party. *See Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019). The plaintiffs must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes*, 914 F.3d at 564. To support its motion, Riddell argues that the plaintiffs have failed to demonstrate the existence of a triable issue regarding general causation. Accordingly, Riddell also contends that it is entitled to summary judgment on all of the plaintiffs' claims.

**1.   Design defect claims**

Under both Texas and Iowa law, which collectively govern all of the bellwether plaintiffs' claims, a plaintiff alleging design defect—based on theories of negligence and strict liability—must provide evidence of causation. In Texas, "[t]o recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the

product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009). Negligent design defect claims similarly require evidence that the negligent design caused the plaintiff's injuries. *See Oasis Oil Corp. v. Koch Refin. Co. L.P.*, 60 S.W.3d 248, 253 (Tex. App. 2001) ("When a products liability action is submitted to the jury on a theory of negligent manufacture or negligent design, the defendant is held liable based on proof that its negligent conduct proximately caused the claimant's damages.").

Iowa law likewise imposes these requirements on plaintiffs asserting such claims, although the Iowa Supreme Court has explained that it "prefer[s] to label a claim based on a defective product design as a design defect claim without reference to strict liability or negligence." *See Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002); *see also Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212, 218 (Iowa 2016) (explaining that products liability law in Iowa "imposes tort liability on sellers or distributors of defective products 'for harm to persons or property caused by the defect'") (quoting Restatement (Third) of Torts: Prods. Liab. § 1, at 5 (1998)). As a general matter, the causation inquiry for the plaintiffs' design defect claims involves both "general" and "specific" causation. As the Court has previously explained, the general causation inquiry regarding a design defect claim concerns "whether the product or exposure has the capacity to cause the injury the plaintiff alleges." Order on Mot. to Dismiss at 6. This is consistent with both Texas and Iowa law. *See Merck & Co., Inc. v. Garza*, 347 S.W.3d 256, 262 (Tex. 2011) (explaining that in products liability

9

actions, "causation . . . has two components: general and specific"). "General causation is whether a substance is capable of causing a particular injury or condition in the general population." *Id.* (quotations omitted); *see also Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 687-90 (Iowa 2010) (discussing general and specific causation requirement in the "toxic tort" context).

In count 1 of the first amended master complaint, the plaintiffs assert a negligent design defect claim and contend that Riddell was "negligent in the design, testing, marketing, and engineering of the helmets warn [sic] by Plaintiffs." Am. Master Compl. ¶ 199. Further, they allege that "[a]s a result of Riddell's breach of duty to the Plaintiffs, they suffered long-term brain injuries." *Id.* ¶ 205. In count 2, the plaintiffs assert a design defect claim sounding in strict liability; they allege that the Riddell helmets worn by the plaintiffs were "defective in design, unreasonably dangerous, unsafe for their intended purpose, and failed to perform as safely as an ordinary consumer would expect . . . because the helmets did not provide adequate protection against the foreseeable risk of concussive brain injury." *Id*. ¶ 207. They further allege that "[t]he design defects created an unavoidable and unreasonable risk of long-term health consequences arising from repeated concussive and sub-concussive blows to the head during football play and practice." *Id.* ¶ 208. "These risks," the plaintiffs allege, "could have been significantly reduced through the implementation of reasonable, relatively affordable, and technologically and scientifically feasible alternative designs." *Id.* The plaintiffs identify three distinct defects in Count 2:

    a.    Helmet frontal pads with materials incapable of adequately distributing force;

    b.    Helmet liner systems that lacked a safe means of attenuating and

>>absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head, both due to the use of inadequate materials and inadequate overall systems (as compared to superior systems such as an air chamber-based system); and
>
>>c. Helmet liner systems comprised of pads too thin to adequately protect players' heads.

*Id.* ¶ 209. The plaintiffs contend that they suffered long-term brain injuries caused by Riddell's defective helmets and that an alternative design—such as one with superior padding—could have reduced their risk of injury. *Id.* ¶ 212.

Riddell argues that the plaintiffs' design defect theory "depends on [an] . . . attenuated causal chain" encompassing "complex issues involving medicine, epidemiology, neuroscience and brain injury mechanism, and football helmet design and engineering." Def.'s Opening Mem. at 1. Riddell contends that the plaintiffs' theory of causation needs to be supported by sufficient expert testimony but that "nothing in [Dr. Benson's report] comes close to the level the plaintiffs need to set forth a triable issue on general causation." *Id.*

Riddell asserts several specific issues regarding Dr. Benson's report. First, Riddell says that his report is vague and conclusory—"[h]e doesn't explain, for example, how he reached or on what methodology he supports his conclusion that 'concussive and sub-concussive blows to the head suffered while playing tackle football can and do cause mTBI and other brain injuries . . . .'" Def.'s Opening Mem. at 7-8 (quoting Dr. Benson's expert report). Next, Riddell contends that Dr. Benson did not consider alternative causes for the plaintiffs' injuries and unnecessarily discusses irrelevant conditions that no plaintiff claims to suffer from—such as Alzheimer's disease. *Id.* at 8. Riddell also argues that Dr. Benson's report does not provide support for the plaintiffs'

11

"contention that Riddell helmets were not properly designed or engineered." *Id.* Riddell also points out that the report's contents are nearly identical to the allegations in the plaintiffs' amended master complaint., suggesting the report is deficient for that reason as well. *See* Def.'s Stat. of Facts ¶ 10 (dkt. no. 368). For these reasons, Riddell contends that the plaintiffs cannot meet their burden with respect to general causation.

In response, the plaintiffs cite, in addition to Dr. Benson's report, a number of scientific studies in support of their claims that football participation and helmet design are causally linked to MTBIs. But none of these scientific studies concern Riddell helmets; many do not even address football helmets at all. They contend that the evidence they have provided is sufficient to raise a triable issue of fact regarding general causation. For instance, they argue that the scientific research on helmet design and MTBIs put Riddell on notice of the causal connection between its helmets and brain injuries, yet it failed to warn consumers of its products' risks with respect to concussions and other MTBIs. *Id.* at 7-22. The plaintiffs also point to the bellwether plaintiffs' deposition testimony regarding their brain injuries and neurocognitive problems—such as memory issues, amnesia, and lightheadedness—as evidence of general causation. *Id.* at 1-2.

The plaintiffs' design defect claim concern various MTBIs, including injuries that can have unknown or multiple origins. In Dr. Benson's expert report, he opines that "[t]he mechanisms underlying these concussions, as well as methods of prevention have been investigated both in the laboratory and in the field." Dr. Benson Expert Rep. (General Causation) ¶ 30. Dr. Benson's report itself thus suggests that to understand MTBIs, one must rely on scientific research and perhaps medical knowledge. *See id.*

12

The Court agrees with Riddell that the origin of the plaintiffs' injuries is not the sort of matter that would be obvious to a layperson.

"When an injury is of this nature, determining what caused it is not usually obvious to a layman and thus requires expert testimony." *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 643 (7th Cir. 2010); *see also In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 388 (E.D. Pa. 2015) ("[t]he case implicates complex scientific and medical issues . . . [and] the association between repeated concussive trauma and long-term neurocognitive impairment remains unclear"). The Court concludes that to prevail on their design defect claims, the plaintiffs need expert testimony on general causation.

In *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698 (7th Cir. 2009), the plaintiffs similarly "sought to establish causation for . . . their claims through the use of expert testimony." *Id.* at 704. The defendant in that case "contested [the expert]'s conclusions regarding both general and specific causation" and "pointed to several notable gaps within [his] cause-and-effect conclusions, which [the defendant] argued were based on mere speculation and therefore inadmissible." *Id.* at 706. The district court in *Lewis* agreed with the defendant and concluded "that the plaintiffs had failed to meet their burden to establish the admissibility of their evidence"; the Seventh Circuit affirmed the district court's decision granting summary judgment to the defendant. *Id.*

The Court concludes that Dr. Benson's expert report falls short of providing evidence sufficient to permit a reasonable jury to find the required connection between Riddell's helmet designs and the plaintiffs' injuries. Dr. Benson's report is sufficient to permit a reasonable finding that a person may suffer brain and/or neurocognitive injuries

13

from playing football. But his report does nothing to connect the plaintiffs' injuries with Riddell's designs. Indeed, the most that Dr. Benson has said regarding design is, in essence, that good helmet design can mitigate the risk of head injuries. *See* Dr. Benson Expert Rep. ¶¶ 30-34. That's all well and good, but it does not advance the ball in establishing that Riddell's designs were deficient, let alone how they were deficient. Without such evidence, the plaintiffs cannot meet their evidentiary burden on general causation regarding their design defect claims. *See, e.g., Williams v. City of Baytown*, 467 S.W.3d 566, 578 (Tex. App. 2015) (noting that the plaintiffs' "expert could not connect his general causation theory . . . to any specific fact . . . in this case"). For this reason, Riddell is entitled to summary judgment on the bellwether plaintiffs' design defect claims.

### 2. Failure to warn claims

Riddell argues that what it contends is the absence of adequate general causation evidence entitles it to summary judgment on all of the plaintiffs' claims, including their failure to warn claims. But the discussion in its briefs is focused exclusively, or nearly so, on design defect claims. Riddell makes no effort to explain what exactly it thinks is required to show causation in a failure to warn case. It seems to take the position that because the plaintiffs have offered nothing regarding how the *design* of Riddell's helmets caused or contributed to their injuries, that also eliminates the possibility of causation from Riddell's *warnings*. This does not make much sense to the Court, at least without some explanation, which Riddell has not meaningfully provided.

"To succeed on a marketing defect claim," under Texas law, "a plaintiff must

prove that the defendant knew or should have known of a potential risk of harm presented by the product, but marketed it without adequately warning of the danger or providing instructions for its safe use." *Ramsey v. Caterpillar Inc.*, No. 12 16 00155, 2017 WL 1426793, at *2 (Tex. App. Apr. 19, 2017) (explaining that "the failure to warn or instruct constituted a causative nexus in the product user's injury") (citing *DeGrate v. Exec. Imprints, Inc.*, 261 S.W.3d 402, 411 (Tex. App. 2008)). Under Iowa law, "[i]n the context of a failure to warn claim, proximate cause can be established by showing a warning would have altered the plaintiff's conduct so as to avoid injury." *Mercer v. Pittway Corp.*, 616 N.W.2d 602, 624 (Iowa 2000) (internal quotations omitted). Riddell does not address the causation inquiry in the failure to warn context at all.

The plaintiffs have not done a particularly good job on this point either, but it is Riddell that has to tee up the issue by showing that there are no genuine factual disputes and that it is entitled to judgment, *see* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment *if the movant shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.") (emphasis added), and it has not done so. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) ("Federal Rule of Civil Procedure 56 imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary."). Riddell is not entitled to summary judgment on the bellwether plaintiffs' failure to warn claims, though the Court expresses no view on the ultimate merits of those claims.

**B.     Riddell's other motions**

Given the Court's ruling that Riddell is entitled to summary judgment on the

plaintiffs' design defect claims even if Dr. Benson's testimony is admitted and that Riddell's motion falls short on the failure to warn claims, the Court need not address Riddell's other motions. These include Riddell's second motion for summary judgment with respect to specific causation and its motions to strike/exclude Dr. Benson's report and testimony. *See* Def.'s Mot. for Summ. J. on Specific Causation (dkt. no. 376); Def.'s Mot. to Strike Pls.' General Causation Expert (dkt. no. 362); Def.'s Mot. to Strike Pursuant to *Daubert* & Fed. R. Evid. 702 Pls.' General Causation Expert (dkt. no. 364); Def.'s Mot. to Strike Pls.' Specific Causation Expert (dkt. no. 374); *Gonzalez v. Madigan*, 403 F. Supp. 3d 670, 680 (N.D. Ill. 2019) (Kennelly, J.) ("because the Court concludes that the defendants are entitled to summary judgment . . . the plaintiff's outstanding motions to strike . . . are moot"); *see also Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 974 (7th Cir. 2001) (affirming district court's decision "to dismiss as moot a motion . . . in light of the grant of summary judgment for the defendant").

## Conclusion

For the foregoing reasons, the Court grants summary judgment in favor of the defendants on the bellwether plaintiffs' design defect claims but denies defendants' summary judgment motions on those plaintiffs' failure to warn claims [dkt. no. 366]. Riddell's other motions [dkt. nos. 362, 364, 374, 376] are terminated without prejudice as moot. The parties are directed to file a joint status report with a joint proposal for further proceedings (or, if they cannot agree, separate proposals) by April 27, 2021.

                                                                                          _____
                                                                                          MATTHEW F. KENNELLY
                                                                                          United States District Judge

Date: April 17, 2021